**DELLWOOD FARMS, INC., et al., Plaintiffs–Appellees,**

v.

**CARGILL, INC., et al., Defendants.**

**No. 97–2494.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1997.

Decided Oct. 30, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 3, 1997.*

---

* Hon. Diane P. Wood did not participate in the consideration of the petition.

Michael J. Freed, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, H. Laddie Montague, Jr. (argued), Charles P. Goodwin, Berger & Montague, Philadelphia, PA, Robert N. Kaplan, Kaplan, Kilsheimer & Fox, New York City, for Dellwood Farms, Sun Dew Sales, Corp., and Vitafood Products, Inc.

Barat S. McClain, Mary Jane Fait, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, H. Laddie Montague, Jr., Charles P. Goodwin, Berger & Montague, Philadelphia, PA, for Rite Foods, Inc.

Edward F. Malone, Jenner & Block, Chicago, IL, Terrence M. Grimm, Winston & Strawn, Chicago, IL, Joseph J. Duffy, Schiff, Hardin & Waite, Chicago, IL, Robert E. Bloch, Mayer, Brown & Platt, Washington, DC, Reid H. Weingarten, Steptoe & Johnson, Washington, DC, John D. Bray, Schwalb, Donnenfeld, Bray & Silbert, Washington, DC, Aubrey M. Daniel, III, Williams & Connolly, Washington, DC, for Cargill, Inc., AE Staley Manufacturing Co., and Archer–Daniels–Midland Co.

Donald R. Harris, Edward F. Malone, Jenner & Block, Chicago, IL, F. Louis Behrends, Behrends & Gentry, Peoria, IL, for American Maize Products Co.

Frank W. Hunger, Office of the United States Attorney General, Washington, DC, Mark Stern (argued), Alisa B. Klein, Carl E. Goldfarb, Department of Justice, Civil Division, Appellate Section, Washington, DC, John J. Powers, III, Department of Justice, Antitrust Division, Appellate Section, Washington, DC, for U.S. Department of Justice.

Joseph J. Duffy, Catherine M. Masters, Schiff, Hardin & Waite, Chicago, IL, John D. Bray, James T. Phalen, Kevin M. Dinan, Schwalb, Donnenfeld, Bray & Silbert, Washington, DC, for Michael D. Andreas.

Reid H. Weingarten, Mark J. Hulkower, Steptoe & Johnson, Washington, DC, for Terry Wilson.

Before POSNER, Chief Judge, and CUMMINGS and ROVNER, Circuit Judges.

POSNER, Chief Judge.

This appeal by the United States from an order by the district judge to turn over to private civil plaintiffs materials that the Department of Justice is holding for use in criminal investigations presents important questions concerning what is known as the "law enforcement investigatory privilege," a judge-fashioned evidentiary privilege. In 1992 the FBI began investigating charges that Archer Daniels Midland had conspired with other agricultural producers to fix the prices of feed and food additives, including lysine, citric acid, and high-fructose corn syrup, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. In the course of its investigation, the FBI made more than 150 hours of audio and video tape recordings of conversations within ADM and between ADM and its competitors germane to the alleged conspiracy. In 1995 the Department of Justice began presenting evidence to grand juries. The grand jury investigating price fixing of lysine has returned several indictments to which ADM and several other defendants have pleaded guilty. ADM has also pleaded guilty to price fixing of citric acid. To induce ADM to plead guilty to these criminal antitrust offenses the government, without seeking or obtaining any kind of confidentiality agreement or protective order, played some of the tapes for the law firm representing ADM's outside directors. The lawyers made notes of what they heard, and these notes were given to the law firm that represents ADM in class action suits brought against ADM and its suspected co-conspirators in the wake of the government's investigation. We do not know who else may have seen the notes.

Some of these suits are scheduled to go to trial in August of next year. The plaintiffs have subpoenaed the tapes in the hope that they contain evidence of illegal conspiracy. They claim that the government waived its investigatory privilege by allowing the lawyers to listen to the tapes, make notes, and turn the notes over to the lawyers who are defending ADM in the civil suits, without insisting on a protective order or confidentiality agreement that would have forbidden the lawyers to whom the government played the tapes to show their notes to anyone except the outside directors and would have forbidden the outside directors to reveal the contents of the tapes or the notes to anyone else. The government does not claim that the tapes are protected from disclosure because they are before a grand jury. Fed. R. Crim. P. 6(e)(2). Maybe they haven't been submitted to a grand jury yet.

The judge, without reaching the issue of waiver, held that the investigatory privilege was inapplicable and ordered the tapes (though only those the government had actually played to the lawyers) turned over to the plaintiffs. It is understood that this means that these tapes will also be made available to the defendants in the civil suits, some of whom are also targets of the government's as yet uncompleted grand jury investigations. The plaintiffs argue in defense of the judge's ruling that the notes of the tapes have given the defendants an unfair advantage in the civil litigation, which can be rectified only by turning the tapes over to the plaintiffs, and that if they must wait until the conclusion of the grand jury investigations before receiving them the trial of the civil suits will be delayed indefinitely, to the plaintiffs' prejudice because witnesses may die or forget. They argue in the alternative that the government waived the privilege by playing the tapes to the outside directors' lawyers without imposing any restriction on the use that the lawyers might make of the information they gleaned from the tapes.

The judge certified his ruling for an immediate appeal under 28 U.S.C. § 1292(b). A motions panel of this court agreed to hear the appeal, but the plaintiffs ask us to reconsider that decision, as we can do, *Sokaogon Gaming Enterprise Corp. v. Tushie–Montgomery Associates, Inc.*, 86 F.3d 656, 658 (7th Cir.1996), and to dismiss the appeal on the ground that it does not satisfy the criteria of section 1292(b), on which see, e.g., *In*

*re Hamilton,* 122 F.3d 13 (7th Cir.1997); *Johnson v. Burken,* 930 F.2d 1202, 1205–06 (7th Cir.1991). We need not consider the merits of the request, as the appeal is securely within our jurisdiction by a different route, the collateral order doctrine. It is true that a discovery order is not deemed collateral even if it is an order denying a claim of privilege. We so held emphatically in *Simmons v. City of Racine,* 37 F.3d 325 (7th Cir.1994), and *Reise v. Board of Regents,* 957 F.2d 293, 295–96 (7th Cir.1992), and this is the view of the other circuits as well, *Boughton v. Cotter Corp.,* 10 F.3d 746, 749–50 (10th Cir.1993), with the partial exception of the Third Circuit. *In re Ford Motor Co.,* 110 F.3d 954, 957–64 (3d Cir.1997). But all these were cases in which the order was directed against a party, so that he had an appellate remedy at the end of the case if the order was erroneous and harmed him. When the order is directed against a nonparty, as it is here, he has no appellate remedy at the end of the litigation, so he is allowed to appeal immediately. E.g., *Ivey v. Harney,* 47 F.3d 181, 183 (7th Cir.1995); *Frazier v. Cast,* 771 F.2d 259, 262 (7th Cir.1985); *Boughton v. Cotter Corp., supra,* 10 F.3d at 749. We can proceed, therefore, to the merits.

■ The law enforcement investigatory privilege is not absolute. It can be overridden in appropriate cases by the need for the privileged materials. *Tuite v. Henry,* 98 F.3d 1411, 1417–18 (D.C.Cir.1996). The balancing of that need—the need of the litigant who is seeking privileged investigative materials—against the harm to the government if the privilege is lifted is a particularistic and judgmental task. It is therefore confided to the discretion of the district judge, meaning that appellate review is deferential. *Id.* at 1415–16; cf. *United States v. Rainone,* 32 F.3d 1203, 1206 (7th Cir.1994); *United States v. International Brotherhood of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997). It seems to us, however, and not only to us, that there ought to be a pretty strong presumption against lifting the privilege. *Black v. Sheraton Corp.,* 564 F.2d 531, 545–47 (D.C.Cir. 1977). Otherwise the courts will be thrust too deeply into the criminal investigative process. Unlike France, Italy, and other European countries in which judicial officers con-

trol the investigation of crimes, the United States places the control of such investigations firmly in the executive branch, subject only to such limited judicial intervention as may be necessary to secure constitutional and other recognized legal rights of suspects and defendants. The plaintiffs in these civil suits, who are seeking to obtain material from the government's criminal investigation, are not criminal suspects or defendants. They thus have no definite legal right to the fruits of the FBI's investigative endeavors conducted in confidence; and it seems to us that neither should they have a right to force the government to tip its hand to criminal suspects and defendants by disclosing the fruits of the surreptitious (but presumably lawful) surveillance that the FBI conducted. The Freedom of Information Act confers on private persons legal rights to certain information in the possession of the government, but contains an exception for information that is collected and is being used for purposes of law enforcement, if disclosure would interfere with enforcement proceedings. 5 U.S.C. § 552(b)(7)(A). The plaintiffs do not assert any right under the Act.

■ Fundamentally they are asking the district court to mediate between their desire to expedite their civil litigation and the government's conduct of its criminal investigation. That is not a proper judicial role. We know this from the cases that hold that (with irrelevant exceptions, based on constitutional rights) the exercise of prosecutorial discretion is not judicially reviewable. *United States v. Armstrong,* —— U.S. ——, ——, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996); *Wayte v. United States,* 470 U.S. 598, 607–08, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547 (1985); *United States v. Giannattasio,* 979 F.2d 98, 100 (7th Cir.1992); *United States v. Bayles,* 923 F.2d 70, 72 (7th Cir.1991). The victim of a crime cannot force the government to prosecute the criminal; equally he cannot say to the government, "Speed up your investigation, or get out of the way, because I want to seek a civil remedy."

■ The district court did not listen to any of the tapes, did not ask what the notes contain or to whom they were shown, did not

consider the alternative of setting a deadline for the grand jury investigations, did not explore the actual prejudice to the plaintiffs from a postponement of the trial, and seems to have been concerned above all, albeit understandably, about carrying this formidable civil litigation on its docket for longer than absolutely necessary. But these features of the district court's evaluation of the subpoena are not at the heart of our concern with the ruling. The heart of our concern is with the principle that the control of criminal investigations is the prerogative of the executive branch, subject to judicial intervention only to protect rights—and no rights of the plaintiffs were invaded by the government's assertion of its law enforcement investigatory privilege.

■ Still, a privilege can be waived and, once waived, is lost. E.g., *United States v. Wimberly*, 60 F.3d 281, 284–85 (7th Cir. 1995); *In re Application of Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir.1997); *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 883–84 (1st Cir.1995). We may assume that this is true of the law enforcement investigatory privilege, although we cannot find a case on the question. And although the issue of waiver is also one on which we defer broadly to the district judge, *United States v. Davis*, 1 F.3d 606, 610 (7th Cir.1993); *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, supra*, 60 F.3d at 884, and the judge made no finding here, the parties have not only briefed the issue but ask us to decide it rather than to remand the case to the district court for it to decide. So we shall decide it.

■ We may assume that like other privileges the investigatory privilege can be "waived" not only in the sense of a voluntary surrender, but also in the sense of forfeiture. *Cole Taylor Bank v. Truck Ins. Exchange*, 51 F.3d 736, 739 (7th Cir.1995). If the government engaged in conduct that would give it an unearned advantage over an opponent were it allowed to keep the tapes secret from him, this conduct would "waive" (in the sense of forfeit) the privilege. See *United States v. Premises Known as 281 Syosset Woodbury Rd.*, 71 F.3d 1067, 1072–73 (2d Cir.1995); *United States v. Billmyer*, 57 F.3d 31, 36–37

(1st Cir.1995); *Irons v. FBI*, 880 F.2d 1446, 1453 (1st Cir.1989) (en banc). There was no voluntary waiver here, at least in the strictest sense (an important qualification, as we are about to see): an express disclaimer of privilege or a public release of the tapes. See *In re Application of Sarrio, S.A., supra*, 119 F.3d at 147, and *Davis v. Greer*, 13 F.3d 1134, 1137–38 (7th Cir.1994). The government did not release the tapes to the public, or indeed turn them over to anybody. It let some lawyers listen to them in the hope that the lawyers would tell their clients, the independent directors of ADM, that the evidence was overwhelming and the board of directors should therefore order the company to throw in the towel. No doubt the government realized that it was tipping, if not its entire hand, at least one or two of its cards; and prudence might have counseled it to extract a promise that none of the lawyers or directors would show the notes to anyone else. But these actions and omissions were not a deliberate waiver of the privilege to withhold the tapes from the plaintiffs in this civil litigation.

■ The cases, however, generally reject a right of "selective" waiver, where, having voluntarily disclosed privileged information to one person, the party who made the disclosure asserts the privilege against another person who wants the information. *United States v. Hamilton*, 19 F.3d 350, 353 (7th Cir.1994); *Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423–27 (3d Cir.1991); Paul R. Rice, *Attorney–Client Privilege in the United States* § 9:27, pp. 9–55 to 9–56 (1993); but see *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir.1977) (en banc) (authorizing selective waiver). And this is a selective-waiver case. Selective waiver must be distinguished from inadvertent disclosure, where a party mistakenly discloses information that it had intended to keep secret. Courts are somewhat less likely to find waiver in such a case. See, e.g., *Redland Soccer Club, Inc. v. Department of the Army*, 55 F.3d 827, 856 (3d Cir.1995); *Alldread v. City of Grenada*, 988 F.2d 1425, 1433–35 (5th Cir. 1993); but see *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, supra*, 60

F.3d at 883–84; *In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir.1989); see generally 6 *Moore's Federal Practice* § 26.47[5], pp. 26–156 to 26–158 (3d ed.1997). Somewhere in between is "partial waiver," where disclosure of a part of a privileged document or set of such documents is argued to waive privilege in the rest of it. *Westinghouse Electric Corp. v. Republic of the Philippines, supra*, 951 F.2d at 1423 n. 7. Partial waiver is not in issue here. Nor inadvertent waiver: the government does not argue that it did not intend to play the tapes for the outside directors' lawyers.

What selective and inadvertent (also partial) disclosure have in common, however, is that neither is waiver in the standard sense in which the word is used in the law: the deliberate relinquishment of a right. See, e.g., *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993); *United States v. Wimberly, supra*, 60 F.3d at 285; *Cole Taylor Bank v. Truck Ins. Exchange, supra*, 51 F.3d at 739; *Harris v. Secretary*, 126 F.3d 339, 343 n. 2 (D.C.Cir. 1997); *Clemmons v. Delo*, 124 F.3d 944, 955–56 (8th Cir.1997). When "waiver" is found in either type of case, the inadvertent or the selective, it is in order to punish the person claiming the privilege for a mistake, rather than to prevent him from changing his mind and retracting a benefit that he had consciously granted to the person from whom he wants to retract it. In the case of selective disclosure, the courts feel, reasonably enough, that the possessor of the privileged information should have been more careful, as by obtaining an agreement by the person to whom they made the disclosure not to spread it further. *In re Horowitz*, 482 F.2d 72, 81–82 (2d Cir.1973).(Friendly, J.); *Eglin Federal Credit Union v. Cantor, Fitzgerald Securities Corp.*, 91 F.R.D. 414, 418–19 (N.D.Ga.1981).

But failing to be careful—committing a mistake that while careless may also be harmless—is not by itself a compelling reason for stripping a person of his privilege; and when we consider the reasons that the courts give for imposing such a harsh sanction for mistake or incaution, we find that they are inapplicable to a case such as this. The reasons, fully explained in the *Westinghouse* case, are a hostility to claims of privilege because if upheld they impede the search for truth, a fear that selective disclosure will be used to obtain a strategic advantage, and puzzlement why if the information is really confidential it was disclosed except for some nefarious strategic purpose. The first reason is not operative here because the issue is delay rather than the permanent suppression of probative evidence. The second is not operative because the government is not an adversary of the persons seeking disclosure. As for the third, the puzzle is not why the government played the tapes for the outside directors' law firm but why it didn't obtain a protective order against any further disclosure. That was a mistake. But the severity of punishment for a mistake should be proportioned to the gravity of the mistake. *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1259 (7th Cir.1995); *Lorenzen v. Employees Retirement Plan*, 896 F.2d 228, 232–33 (7th Cir.1990); *Okaw Drainage District v. National Distillers & Chemical Corp.*, 882 F.2d 1241, 1247–48 (7th Cir.1989). Since there is no indication either that the government was acting in bad faith or that the plaintiffs in the present suits were hurt—and, to repeat, the government is not trying to take advantage of an adversary—interfering with a criminal investigation would be an excessive punishment.

"Or that the plaintiffs ... were hurt." A distinct ground for finding waiver here might be the presence of conduct that warranted declaring a forfeiture. (We repeat that a rejection of "selective waiver" is best understood as an application of forfeiture doctrine, since it is not a waiver in the strict sense of the deliberate relinquishment of a right.) The government is not the adversary of these plaintiffs, using coy disclosure to gain litigating leverage over them; and because the plaintiffs have never used their unquestioned powers of pretrial discovery to obtain a list of the persons to whom the notes have been shown, they have failed to lay a factual foundation for showing that they have been hurt by the government's allowing the notes to get into the hands of the defense in the civil suits. Cf. *Cagan v. Mutual Benefit Life Ins. Co.*, 28 F.3d 654, 656 (7th Cir.1994); *Daigle v. Maine Medical Center, Inc.*, 14 F.3d 684, 692 (1st Cir.1994). We do not even know

whether ADM's counsel in these suits has shared the notes with counsel for its codefendants; we do not know whether the defendants have decided to hang separately or together. And even if there was some harm to these plaintiffs from the government's failing to obtain a confidentiality agreement or protective order, it would not be a sufficient harm to warrant a finding of forfeiture, since the harm can easily be cured by postponing the civil trial. Probably the trial *will* be postponed beyond August 31, 1998, anyway; for litigation of this size rarely proceeds on schedule, and of course it may be settled before trial. We imagine that the plaintiffs would want in any event to wait until the tapes were available for use in evidence, even if they had no argument for waiver.

The plaintiffs point out that three witnesses have died already. We cannot resurrect them by our ruling; we assume that the point of the plaintiffs' reference to mortality is to remind us that the rest of the witnesses may die as well if the case is delayed indefinitely. But if the tapes contain as much good evidence for the plaintiffs as the plaintiffs think, it would be rather a detail if some more witnesses die before the trial; and their testimony can in any event be memorialized in depositions and used freely at trial if they do die. Fed.R.Civ.P. 32(a)(3)(A).

The district court's order is reversed with instructions to quash the subpoena.