In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-4110 & 01-1810

UNITED STATES of America ex rel.
Janet CHANDLER, Ph.D.,

Plaintiff-Appellant,
Cross-Appellee,

v.

COOK COUNTY, Illinois,/1

Defendant-Appellee,
Cross-Appellant.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 514--Robert W. Gettleman, Judge.

ARGUED SEPTEMBER 5, 2001--DECIDED January 22, 2002


   Before FLAUM, Chief Judge, and POSNER and
RIPPLE, Circuit Judges.

   RIPPLE, Circuit Judge.  Janet Chandler,
Ph.D., brought this quitam action as
relator on behalf of the United States
under the False Claims Act ("FCA"), 31
U.S.C. sec.sec. 3729 et seq., to recover
funds that allegedly were obtained
fraudulently by defendants Hektoen
Institute for Medical Research
("Hektoen") and Cook County, Illinois, in
the administration of a drug treatment
program. The district court dismissed the
suit against Cook County, holding that,
as a municipality, the County was immune
from punitive damages under the FCA. Dr.
Chandler appealed and, for the reasons
set forth in this opinion, we reverse in
case No. 00-4110.

   Cook County also appealed or, in the
alternative, requested mandamus, from the
district court's discovery order
requiring Cook County to turn over
certain drug treatment records. We
believe the district court's discovery
order does not comply with federal
privacy regulations. Therefore mandamus
will issue requiring the district court
to vacate its discovery order and to
proceed in conformity with this opinion.

I

BACKGROUND

A.  Cook County as a Party

Dr. Janet Chandler brought this quitam action against Hektoen and Cook County for alleged misconduct in their handling of a federal research grant./2 Cook County Hospital ("CCH") applied for, and received, a $5 million grant from the National Institute of Drug Abuse ("NIDA") to study the treatment of drug-dependant pregnant women. Along with its grant application, CCH submitted an assurance of compliance plan to the Department of Health and Human Services ("HHS"), representing that CCH would comply with federal human subject research regulations. The grant initially was awarded to CCH, but was transferred to Hektoen, an affiliate of CCH established to receive funds and conduct medical research. The program was dubbed "New Start"; it was designed to provide treatment and conduct research. New Start provided treatment to drug-dependant pregnant women and studied the effect of a stepped-up battery of medical and social services on its patients, compared with a control group receiving the typical treatment available in the community.

On September 1, 1993, Dr. Chandler was hired as New Start's project director. While in this post, Dr. Chandler came to believe that the defendants were violating the terms of the grant and federal regulations. Further, she believed they were misrepresenting the success of the New Start program and submitting false progress reports to the government, which included information on "ghost" program participants who did not exist. Dr. Chandler alleged that CCH did not follow mandatory protocol for research on human subjects and for dispensing methadone to pregnant women, did not obtain informed consent from study participants, did not obtain thorough medical or drug histories, provided substandard care, failed to keep accurate records and failed to randomize participants.

In 1994, Dr. Chandler began to speak up,

informing physicians at CCH that she was concerned with the handling of the New Start program. She told them that the program was violating the terms of the grant, the assurance of compliance plan and pertinent federal regulations. Ultimately Dr. Chandler was discharged and brought this action. She alleged that CCH retaliated against her by revoking some of her responsibilities and then firing her in January 1995, after she was accused of lying in her report to NIDA on the study's alleged failure.

Cook County moved to dismiss on the ground that it was not a "person" within the meaning of the False Claims Act. See 31 U.S.C. sec. 3729(a)./3 The district court denied Cook County's motion to dismiss, holding that the County was a person within the meaning of the FCA. See Chandler v. Hektoen Inst., 35 F. Supp.2d 1078, 1084 (N.D. Ill. 1999) (Chandler I). Specifically, the court was persuaded by the definition of person within the Civil Investigative Demand ("CID") provision of the FCA, added in 1986. See 31 U.S.C. sec. 3733(l)(4); Chandler I, 35 F. Supp.2d at 1084. The statute defines person as "any natural person, partnership, corporation, association, or other legal entity, including any State or political subdivision of a State." 31 U.S.C. sec. 3733(l)(4). The district court further held that the treble damages provision of the FCA was not punitive, so that municipalities' traditional immunity from punitive damages was not implicated. See Chandler I, 35 F. Supp. 2d at 1084-85. Therefore, Cook County's motion was denied.

In 2000, the Supreme Court decided Vermont Department of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000). Stevens held that states were not persons within the meaning of the FCA and concluded that the trebledamages provision was punitive. See id. at 783-84. Cook County filed a motion to reconsider in light of Stevens. See Chandler v. Hektoen Inst., 118 F. Supp.2d 902, 902 (N.D. Ill. 2000) (Chandler II). The district court found nothing in Stevens to "alter its conclusion that the County is a 'person' for purposes of the FCA" but found that "it is quite clear that under Stevens the County is immune from the imposition of punitive damages." Id. at 903. The court dismissed the case

against Cook County.

B.  Discovery

   Dr. Chandler brought this action on January 27, 1997. She sought the records of the New Start program in discovery. The voluminous records contained inter alia physicians' notes, consent forms, medical records, patient questionnaires and drug test results. The County resisted, pointing to federal regulations requiring researchers to keep drug and alcohol treatment records confidential. On January 7, 1999, the district court granted Dr. Chandler's motion to compel and ordered Cook County to produce the records with patient-identifying information redacted. Notice was sent to the former New Start patients, informing them that "Janet Chandler has been given permission by the Court to review your New Start records, so long as all the identifying information and other personal information on the records is blacked out." R.72, Ex.B. The notice also provided the former patients with forms to reply if they wanted to object to the disclosure or if they consented to the disclosure of identifying information. The patients were informed that if they did nothing, the redacted records would be disclosed to Dr. Chandler and her representatives.

   Over the next year or so, the parties were contentious about the quality of the redacted records. Dr. Chandler's attorneys claimed that many records were missing or incomplete. There was a problem with the index created by Cook County to obscure patient identifying information in compliance with the court's discovery order. The court ordered the County to produce a "key" to cross-reference original and substituted file numbers because the substituted file numbers could not be linked with a large quantity of study data. In early 2001, Dr. Chandler went back to the district court seeking access to the unredacted patient records.

   On March 5, 2001, the district court ordered Cook County to turn over unredacted patient records to Dr. Chandler's representatives and asked the parties to draft protective orders. On March 14, 2001, the district court entered a protective order governing the

disclosure of unredacted patient records to Dr. Chandler's attorneys. The order limited disclosure to three of Dr. Chandler's attorneys and one paralegal for ten days. They were prohibited from disclosing information to anyone, including Dr. Chandler and were not permitted to record any of the information. Cook County sought an emergency stay pending appeal. After briefing from both sides, the motions panel of this court granted the stay on June 12, 2001 and denied Dr. Chandler's motion to dismiss for want of jurisdiction. We consolidated the two appeals.

II

DISCUSSION

The False Claims Act establishes civil penalties for "[a]ny person" who, inter alia, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," or who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. sec. 3729(a)(1), (3). Such a person "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains be cause of the act of that person." Id. sec. 3729(a). The FCA may be enforced by the Attorney General, id. sec. 3730(a), or by a private person, known as a relator, who brings a quitam suit "for the person and for the United States Government . . . in the name of the Government," id. sec. 3730(b). A quitam suit is filed in camera, and remains under seal for sixty days. Id. sec. 3730(b)(2). The relator must present all material evidence to the Government; during the sixty day period, the Government may intervene and proceed with the action itself. Id. If the Government declines to assume responsibility for the suit, the relator may proceed on his own. Id. sec. 3730(b)(4)(B). If the suit is successful, the relator receives a portion of the Government's award. Id. sec. 3730(d). If the Government takes over, the relator will receive between 15 and 25 percent of the Government's proceeds, "depending upon the extent to

which the person substantially contributed to the prosecution of the action," plus reasonable expenses. Id. sec. 3730(d)(1). If the relator proceeds on his own, he will receive between 25 and 30 percent of the proceeds, plus reasonable expenses. Id. The quitam relator is also protected by a "whistleblower" provision which provides relief to any employee who suffers retaliation for bringing a claim under the FCA or assisting an employee-relator who does so. Id. sec. 3730(h). The whistleblower protection extends to any relator who brings a claim in good faith, whether or not it is successful.

A.

We must determine whether Cook County is a "person" within the meaning of the FCA./4

The issue is one of statutory interpretation. Therefore we must ascertain the will of Congress; we must determine whether Congress, when it enacted the FCA, intended counties to be defendants in quitam suits.

We begin, as always, with the text of the statute. Congress provides no definition of "person" within sec. 3729. There have been only cosmetic changes to this section since the FCA was first adopted in 1863; therefore, the definition of person has remained constant throughout the FCA's history. See Stevens, 529 U.S. at 783 n.12. The Supreme Court has noted that, by 1844, both private and municipal corporations were presumptively included within the meaning of "person." See Monell v. Dep't of Soc. Serv., 436 U.S. 658, 685-89 (1978). Nowhere in the text is there an exception for suits against municipalities. Nor have the parties suggested any other statutory provision that would limit the text before us.

The structure of the statute does not appear to bar a finding that counties may be sued under the FCA. The FCA creates a mechanism designed to discover and correct fraud against the federal government. In a quitam suit, the relator must inform the Department of Justice of his intention to sue and must keep his suit under seal for sixty days while the Justice Department decides whether to

prosecute the action itself./5 The parties have not suggested anything in the structure of the FCA, when read as a whole, that would require anything other than a straight-forward reading of the text.

The 1986 amendments to the FCA did not change the meaning of "person" nor did these legislative changes explicitly include or exclude suits against municipalities. However, three of the changes to the FCA made by Congress in 1986 are relevant to this case. That year, Congress adopted what is now 31 U.S.C. sec. 3733, which permitted the Attorney General to issue a Civil Investigative Demand ("CID") to "any person" who "may be in possession, custody, or control of any . . . information relevant to a false claims law investigation." See 31 U.S.C. sec. 3733(a)(1). A CID requires its recipient to produce documents, answer interrogatories and give oral testimony. Id. Political subdivisions of states were included within the CID provision's definition of "person." See id. sec. 3733 (l). Second, Congress adopted a "whistleblower" statute, protecting relators and their witnesses from retaliation by employers. See id. sec. 3730(h). Finally, Congress increased the penalties for violations, from $2,000 per claim and double damages to $5,000-$10,000 per claim and treble damages. Id. sec. 3729(a)./6 We believe that a proper understanding of each of these changes points to a finding of continued municipal liability.

The CID provision was added to provide the Justice Department with a new weapon to discover fraud and investigate false claim suits. That section defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any State or political subdivision of a State." Id. sec. 3733(l)(4)./7 The CID's defini-tion of person at least demonstrates that Congress intended that states and their subdivisions be potential targets of false claim investigations. Although this definition does not demonstrate Congressional intent to impose liability on municipalities, it certainly does not support an inference that Congress intended them to be exempt. Every change made in 1986 made it more likely for FCA

claims to be filed and to succeed.

   Further, the legislative history of the 1986 amendments, in particular that accompanying the whistleblower provision, makes it likely that the Congress, when voting on the amendments, was aware that the FCA might reach municipalities. The Senate Judiciary Committee's report states that "[t]he False Claims Act reaches all parties who may submit false claims. The term 'person' is used in its broad sense to include partnerships, associations, and corporations . . . as well as States and political subdivisions thereof." S. Rep. 99-345 at 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273./8 In discussing the whistleblower provision, the Com-mittee report defines "employers" to "include public as well as private sector entities." See id. at 34-35. Unless municipalities are subject to suit under the FCA, Congress would have no reason to be concerned that municipalities might retaliate against their employees for bringing FCA claims. Given that states are excluded from the definition of "person" within the FCA, the only public entities remaining are municipal corporations and other political subdivisions of states which are not arms or agencies of state government.

   This reading of the 1986 amendments is compatible with other evidence that Congress' purpose in enacting those amendments was to increase the effectiveness of the Act. See S. Rep. No. 99-345 at 2 (1986) ("In order to make the statute a more useful tool against fraud in modern times, the Committee believes the statute should be amended in several significant respects. The proposed legislation seeks not only to provide the Government's law enforcers with more effective tools, but to encourage any individual knowing of Government fraud to bring that information forward."). Congress also increased the percentage of the Government's proceeds a relator may receive where the Government assumes responsibility for the action. Before 1986, a relator's share was capped at ten percent of the award. See 31 U.S.C. sec. 3729 (c)(1) (1983). Now, a court has discretion to give the relator between fifteen and twenty-five percent, but fifteen percent is the minimum award. 31 U.S.C. sec. 3730(d)(1). Before 1986, if a

relator proceeded on his own, his potential award was capped at twenty-five percent, see 31 U.S.C. sec. 3729(c)(2) (1983); now twenty-five percent is the minimum he would receive, with a maximum of thirty percent. 31 U.S.C. sec. 3730(d)(2). These changes both encourage quitam suits and encourage cooperation with the Department of Justice.

The 1986 amendments also added several provisions which deter frivolous suits and give courts the discretion to restrict a relator's participation in suits when the Government has intervened. The district court can restrict the relator's participation if he remains in the case for purposes of harassment, 31 U.S.C. sec. 3730(c)(2)(C); the court may stay discovery if the relator's actions interfere with the Government's investigation, id. sec. 3730(c)(4). If the basis for the suit was information that was already available, a district court may limit a relator's recovery to 10 percent of the award, id. sec. 3730(d)(1), or bar the suit entirely unless the Attorney General prosecutes the case, id. sec. 3730(d)(4)(A). If the relator himself planned or was guilty of violations of the FCA, the court may dismiss his suit. Id. sec. 3730(d)(3). If the relator proceeds with the suit himself and the court finds that the suit was "clearly frivolous, clearly vexatious or brought primarily for purposes of harassment," the court may award the defendant attorneys' fees and expenses. Id. sec. 3730(d)(4). Finally, the FCA bars suits against members of Congress, members of the judiciary and senior executive branch officials. Id. sec. 3730(e)(2). These changes gave courts more discretion to regulate quitam suits and to weed out illegitimate actions.

Congress also changed the knowledge element of the offense, making success more likely. Some confusion had arisen about the standard of intent necessary for a finding of liability under the FCA. Congress adopted sec. 3729(b) which defines knowing and knowingly to mean that a person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard for the truth or falsity of the information, and no proof of specific intent to defraud is

required." 31 U.S.C. sec. 3729(b). This definition sets a fairly low standard, making it easier for the United States to prevail in FCA actions.

We must conclude that a study of the text and structure of the Act, supported by the available legislative history, leads to the conclusion that Congress intended to include counties within the meaning of "person."

B.

Cook County nevertheless urges that we are prohibited from interpreting the statute to include counties because of the municipalities' traditional, common-law immunity from punitive damages. The Supreme Court in Stevens stated that, by increasing the damages from double to treble in 1986, the FCA was transformed from a remedial statute to a punitive one. See Stevens, 529 U.S. at 785-86./9 Because damages under the FCA are now considered to be punitive, we turn to the question of whether Congress has made it sufficiently clear that municipalities do not enjoy the traditional common-law immunity of municipalities from punitive damages for FCA claims.

We begin with the Supreme Court's decision in City of Newport v. Fact Concerts, 453 U.S. 247 (1981). See Doe v. County of Centre, 242 F.3d 437, 454 (3d Cir. 2001) (using City of Newport to analyze whether municipalities were immune from punitive damages in suits brought under the Americans with Disabilities Act and the Rehabilitation Act). In Newport, the Court was called upon to decide whether a municipality was immune from punitive damages under 42 U.S.C. sec. 1983. See Newport, 453 U.S. at 249. The Court could find no evidence that Congress intended to disturb thesettled common-law immunity of municipalities from punitive judgments. See id. at 265. Under the sec. 1983 statutory scheme, there is no guidance from Congress as to the damages to be imposed, or to the limits on the amount of punitive damages a jury may assess.
Compensatory damages, designed to make the victim of unconstitutional behavior whole, are a permissible basis of recovery and, although punitive damages, properly calculated, serve many salutary purposes when a truly egregious situation

is presented, they remain a windfall for the fully compensated plaintiff. There is always the danger that the "deep pocket" of the municipality's tax base will tempt a jury to succumb to an unprincipled determination. See Newport, 453 U.S. at 270. In light of these factors, the Court in Newport found no basis for disregarding the presumption that a municipal entity ought not be subjected to such a liability.

In Newport, the court identified a "two-part approach" for "scrutinizing a claim of immunity proffered by a municipality." Id. at 259. Such a claim requires "careful inquiry into considerations of both history and policy" to determine "both the policies that it [the immunity] serves and its compatibility with the purposes" of statutes, id. Earlier, in Owen v. City of Independence, 445 U.S. 622, 635 (1980), the Court had noted that "the question of the scope of a municipality's immunity from liability . . . is essentially one of statutory interpretation." For instance, in the context of sec. 1983, the Court concluded in Newport that immunity from punitive damages was not inconsistent with the purposes of sec. 1983, see Newport, 453 U.S. at 271; however, in Owen, the Court held that municipal immunity based on the good faith of its officers was inconsistent with sec. 1983, see Owen, 445 U.S. at 657. In both cases, the Court looked at the fit between the purpose of the asserted immunity and the Congressional intent in enacting sec. 1983.

Given the Supreme Court's analysis in Newport, we must examine the purpose of municipal immunity from punitive damages to determine if it is consistent with the False Claims Act. In the context of section 1983, the Supreme Court wrote in Newport: "Compensation was an obligation properly shared by the municipality itself, whereas punishment properly applied only to the actual wrongdoers." Newport, 453 U.S. at 263. Punitive damages are borne by "the very taxpayers and citizens for whose benefit the wrongdoer [is] being chastised." Id. Ordinarily, punitive damages "are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing

the bill." Id. at 267.

However, not all punitive damage regimes are identical. Indeed, there are important differences between those available under sec. 1983 and those imposed by the FCA. Under the FCA, at least a portion of the recovery will come from the monies taken by the municipality through its false claims, whereas under sec. 1983 both the compensatory and punitive damages come directly from the tax base. Further, in the FCA context, the taxpayers themselves have been enriched by the fraudulent conduct of the municipality. Presumably any ill-gotten gains from the federal government produce more services or lower taxes. Thus, even though some of the burden of the FCA's treble damages shifts to the local taxpayers, this shift is not unjust, because the local taxpayers have already received, without justification, some of the benefit. Congress' precision in crafting the FCA's damage regime suggests to us that it carefully considered all its options before enacting this particular system. Unlike sec. 1983, the FCA does not need to borrow a common-law conception of damages; Congress has provided a clear and consistent remedy for all violations of the FCA. And, unlike under sec. 1983, we need not worry about the "broad discretion traditionally accorded to juries in assessing the amount of punitive damages," Newport, 453 U.S. at 270, because the FCA affords the judge little discretion in imposing penalties on offenders.

The FCA damages scheme mandated by Congress is not divided into compensatory and punitive damages. Under the FCA, damages are limited to $10,000 per claim plus three times the amount of the false claims. 31 U.S.C. sec. 3729(a). Although the trebling of the actual loss is indeed a significant enhancement and punitive in nature, it is nevertheless a response specifically determined by Congress as necessary for the effective operation of the FCA. It could not be more clear that Congress, in adopting this approach, addressed the situation with careful precision as to what sort of damage scheme was necessary to achieve the goals of the statute. Notably, Congress did make an exception to the general measure of damages when the person who has defrauded the Government cooperates

before having learned of the investigation. 31 U.S.C. sec. 3729(a)(7)(A)-(C). In such a case, the court has discretion to impose double, rather than treble, damages. Id. The damages are imposed by the judge, not the jury. See In re Schimmels, 85 F.3d 416, 416 n.1 (9th Cir. 1996). By contrast, Congress made no adjustment to the general scheme for municipal entities.

The Supreme Court has noted that the definition of "person" has remained unchanged since the adoption of the FCA in 1863. See Stevens, 529 U.S. at 782-83. As noted above, counties were subject to suit in 1863. Were we to hold counties immune from the FCA's damages scheme, we would frustrate the clear intention of Congress. The original FCA damages regime was remedial. See United States v. Bornstein, 423 U.S. 303, 315 (1976). In 1986, in an effort to increase the effectiveness of the FCA, Congress increased the per claim penalty from $2,000 to a minimum of $5,000 and the overall damages from double to treble. To hold that municipalities are immune, we would have to conclude that, in effecting this increase, Congress intended to exempt municipalities from the FCA sub silentio.

Congress was aware of the Court's decisions in Newport and Bornstein; it was only in 2000 that the Supreme Court characterized the FCA's remedy as punitive. Congress also was aware of the presumption that municipalities are included within the meaning of the term "person," see Monell v. Dep't of Soc. Serv., 436 U.S. 658, 685-89 (1978), and that municipalities are treated differently from states within our constitutional system, see Comm. Communications Corp. v. Boulder, 455 U.S. 40, 51-53 (1982), superseded by 15 U.S.C. sec.sec. 34-36; Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 394-96 (1978), superseded by 15 U.S.C. sec.sec. 34-36. In enacting the 1986 changes to the statute, which form the basis of Cook County's immunity argument, Congress did not indicate in any way that it intended to exempt municipal entities from the scope of the statute. When it desires to exempt municipal entities from federal statutory schemes, Congress has not hesitated to do so. See, e.g., 15 U.S.C. sec.sec. 34-36 (exempting local

government units from liability for damages under the antitrust statute); 42 U.S.C. sec. 1981a(b)(1) (exempting governments from punitive damages under employment discrimination statute).

Dr. Chandler and the United States suggest that, if we hold Cook County to be immune from punitive damages, we ought to hold further that Cook County may still be sued under the FCA, but be held to a lower measure of damages. In our view, the legislative record affords us no justification for undertaking such judicial blue-penciling of the statute. Congress has provided one remedy for violations of the False Claims Act. If municipalities are immune from punitive damages, then they are, effectively, immune from liability under the FCA. There is no indication that Congress intended the FCA to apply to municipal entities but at a lower penalty. See United States ex rel. Garibaldi v. Orleans Parish Sch. Bd., 244 F.3d 486, 493 (5th Cir. 2001). As we have just noted, the penalty scheme is a carefully measured approach by Congress designed to impose a penalty compatible with the objectives of the Act. We therefore must either apply the entire statute to municipal entities or declare them to be exempt under the FCA.

Billions of dollars flow from the federal government to municipalities each year. Congress, in creating, in 1863, and then strengthening, in 1986, a comprehensive mechanism designed to remedy fraud against the federal government clearly determined that recipients of federal funds must be subject to such a deterrent. Given this legislative judgment, municipalities' common-law immunity from suit is inconsistent with Congress' purpose in adopting the FCA. Unlike sec. 1983, which creates a cause of action without specifying a remedy, the FCA includes a carefully crafted remedy for violations. Accordingly, despite the presumption against the imposition of punitive damages on municipalities, it is clear that Congress, in enacting the 1986 changes to the FCA, made a conscious choice to increase the recoverable damages while in no way indicating that it wished to exempt municipalities. Therefore, the interpretive presumption has been overcome.

C.

Nevertheless, Cook County contends, the Supreme Court's decision in Stevens mandates a different result. The district court, as had the Fifth Circuit, see Garibaldi, 244 F.3d at 493-94, agreed. We believe that this proposition is unsound and respectfully disagree with the conclusion reached by our sister circuit./10 In our view, such a reading of Stevens cannot be squared with the essential rationale of that opinion nor with the established doctrinal differences, long recognized in our jurisprudence, between the status of the states of the Union and municipal entities. See Stevens, 529 U.S. at 779-80. Stevens quite appropriately recognizes that the states, as sovereign entities within our federal union, must be accorded, in their relationships with the federal government, certain attributes of sovereignty. Cf., Printz v. United States, 521 U.S. 898, 918-21, 926-28 (1997) (holding that Congress could not commandeer state executive officers to enforce federal gun control law); Seminole Tribe v. Florida, 517 U.S. 44, 55, 70-72 (1996) (holding that Congress cannot abrogate states' 11th Amendment immunity through the powers granted in Article 1 of the federal constitution). Among these attributes is the presumption that states, as sovereigns, are not included within the term "person." See Stevens, 529 U.S. at 780.

The central holding of Stevens is that states are not within the FCA's definition of "person" because of the "longstanding interpretive presumption that 'person' does not include the sovereign." Stevens, 529 U.S. at 780. "The presumption is 'particularly applicable where it is claimed that Congress has subjected the States to liability to which they had not been subject before.'" Id. at 781 (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989)). This presumption is applied to protect the states because of their dignity as sovereigns within our system of federalism. It is akin to the clear statement rule which requires "that if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear

in the language of the statute." Will, 491 U.S. at 65 (internal citations and quotations omitted). The presumption cuts the other way for municipalities. See Monell v. Dep't of Soc. Serv., 436 U.S. 658, 685-89 (1978). The Supreme Court has never imposed this same requirement on Congressional efforts to make municipal entities amenable to federal legislation. Cf. Bd. of Trustees v. Garrett, 531 U.S. 356, 368-69 (discussing the different requirements for imposing federal liability on states and municipalities); Monell, 436 U.S. at 701 (stating that absent a clear statement to the contrary, municipalities were presumptively included within the meaning of the term "person"). Such constitutional concerns applicable to states do not apply to municipalities. Therefore, there is no such rule of construction applicable here. Cf., Garrett, 531 U.S. at 368-69 ("[Cities and counties] are subject to private claims for damages under the ADA without Congress' ever having to rely on sec. 5 of the Fourteenth Amendment to render them so. It would make no sense to consider constitutional violations on their part . . . when only the States are the beneficiaries of the Eleventh Amendment."); Alden v. Maine, 527 U.S. 706, 756 (1999) ("The second important limit to the principle of sovereign immunity is that it bars suits against States but not lesser entities. The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State."). The rationale of Stevens simply cannot support the interpretation that Cook County wishes to place on it.

Accordingly, counties are not only amenable to the FCA but also are subject to the same penalties as other defendants.

III

A.

In light of the above discussion, Cook County will once again be a party to this action. We therefore must address its appeal of the district court's discovery order of March 14, 2001. Normally, discovery rulings are unappealable, because the disadvantaged party has a remedy at the end of the district court

proceedings./11 This court has held that a party seeking to obtain appellate review of a discovery order before judgment should accept a contempt citation, and then appeal. See Allendale Mutual Ins. Co. v. Bull Data Sys. Inc., 32 F.3d 1175, 1179 (7th Cir. 1994). "[R]equiring the complaining party to take some risk--to back up his belief with action--winnows weak claims." Reise v. Bd. of Regents, 957 F.2d 293, 295 (7th Cir. 1992). However, in extraordinary circumstances, mandamus may be an appropriate remedy where the petitioner can show "irreparable harm . . . and a clear right to the relief sought." In re Sandahl, 980 F.2d 1118, 1119 (7th Cir. 1992). We believe Cook County has made such a showing here.

"Mandamus may not be used to get around the limitations on the appealability of interlocutory orders." Mulay Plastics, Inc. v. Grand Trunk Western R.R. Co., 742 F.2d 369, 371 (7th Cir. 1984). However, the circumstances here present the necessary predicate for such an extraordinary remedy. The district court's discovery order implicates regulations protecting the confidentiality and integrity of federally-funded substance abuse programs. See 42 U.S.C. sec. 290dd-2; 42 C.F.R. sec.sec. 2.11, 2.63-64. If Cook County is correct, allowing Dr. Chandler's representatives to view the unredacted patient records would cause serious harm to those patients' privacy rights and to the federal programs protected by a comprehensive regulatory scheme. Congress and the Department of Health and Human Services have made it clear that regulations are necessary to protect "the patient, the physician-patient relationship, and the treatment programs." See 42 C.F.R. sec. 2.64(d). It is not only the privacy rights of individual patients that are at stake here, but also the continued effectiveness and viability of important substance abuse treatment programs. See United States v. Smith, 789 F.2d 196, 205-06 (3d Cir. 1986) (noting that "there is a public interest in maintaining the confidentiality of patient records" in drug and alcohol treatment programs). Patients will be less willing to seek treatment if patient confidentiality is not strictly protected. The First Circuit, in upholding the validity of

sec. 2.63 wrote: "The purpose of [the statute] is clear. Congress recognized that absolute confidentiality is an indispensable prerequisite to successful alcoholism research. Moreover, confidentiality is necessary to encourage successful alcoholism treatment. Without guarantees of confidentiality, many individuals with alcohol problems would be reluctant to participate fully in alcoholism programs." Whyte v. Conn. Mut. Life Ins. Co., 818 F.2d 1005, 1010 (1st Cir. 1987); see also Mosier v. Am. Home Patient, Inc., 170 F. Supp.2d 1211, 1214 (N.D. Fla. 2001) (noting that "this particular privilege is a strong one"). The same is true of drug treatment. In short, because important private and public rights will be irretrievably compromised if the County is correct but the information is nevertheless released prior to the entry of a final judgment, mandamus is an appropriate remedy.

B.

   We therefore turn to an assessment of Cook County's contention that the district court's order is violative of the statute and regulations.

   Federal law restricts the disclosure of information obtained "in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation or research" conducted by the United States or with federal money. 42 U.S.C. sec. 290dd-2. Disclosure is permitted with patient con sent, 42 U.S.C. sec. 290dd-2(b)(1), or "[i]f authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor, including the need to avert a substantial risk of death or serious bodily harm," id. sec. 290dd-2(b)(2)(C). "In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. . . . [T]he court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure." Id. sec. 290dd-2(b)(2)(C).

The regulations divide information into two categories-- confidential and non-confidential communications. The New Start records contain both. In both situations, when a court is preparing to order disclosure, notice must be sent to the patients and they must be afforded "[a]n opportunity to file a written response to the application, or to appear in person, for the limited purpose of providing evidence on the statutory and regulatory criteria for the issuance of the court order." 42 C.F.R. sec. 2.64(b). Such notice must be "adequate." Id. Notice was sent in 1999, after the district court's ruling on January 7 of that year granting Dr. Chandler's motion to compel. That notice informed patients that redacted copies of their records would be disclosed to Dr. Chandler's counsel. By contrast, patients have not been notified, and the March 14 order does not contemplate such notice, that unredacted copies of their records will be disclosed to Dr. Chandler's representatives. To be adequate, notice must inform patients both of the nature of the disclosure and to whom the information will be disclosed. Patients must know what is at stake before they can make an informed decision about their potential intervention in Dr. Chandler's lawsuit. Patients who may not have been concerned enough about the disclosure of redacted records to intervene may well wish to be heard if the court is prepared to order disclosure of unredacted records.

Once notice has been given, with respect to both confidential and other communications, the district court must find that "(1) other ways of obtaining the information are not available or would not be effective; and (2) the public interest and need for disclosure outweigh the potential injury to the patient, the physician-patient relationship and the treatment services." 42 C.F.R. sec. 2.64(d). If a patient does not consent, confidential communications may only be disclosed by court order if:

(1) The disclosure is necessary to protect against an existing threat to life or of serious bodily injury . . . (2) The disclosure is necessary in connection with investigation or prosecution of an extremely serious crime, such as one which directly

threatens loss of life or serious bodily injury, including homicide, rape, kidnapping, armed robbery, assault with a deadly weapon, or child abuse and neglect; or (3) The disclosure is in connection with litigation or an administrative proceeding in which the patient offers testimony or other evidence pertaining to the content of confidential communications.

42 C.F.R. sec. 2.63(a). Because none of those conditions apply here, any confidential communications must be redacted before Dr. Chandler's representatives may view the records.

The district court's discovery order violates these regulations. It permits four individuals, three of Dr. Chandler's attorneys and a paralegal, to view all of the records for ten days. It places no restrictions on the type of information that will be made available to them. The statute and regulations do not contemplate even limited disclosure of non-confidential communications without notice or of confidential communications without one of the conditions of sec. 2.64 being satisfied./12 Dr. Chandler maintains that she has no need to view confidential materials, therefore, the court should be able to craft an order which satisfies both the regulations and Dr. Chandler's legitimate need to view some of the non-confidential communications.

Mandamus will issue requiring the district court to vacate its discovery order. Given the lapse of time between the 1999 notice and the disclosure, new notice should be sent to all patients whose records might be examined by Dr. Chandler's representatives. Further, notice must be sufficiently clear that the New Start patients will understand, without the aid of counsel, what is at stake and what they must do to assert their rights. No disclosure may be made until sufficient time has passed to give the patients an opportunity to decide whether to intervene and to seek legal assistance.

Conclusion

Cook County is a person within the meaning of the False Claims Act and does not enjoy immunity from the FCA's damages

scheme. Therefore, the district court's decision in 00-4110 is REVERSED and the case is REMANDED with orders to reinstate Cook County as a party to this action. The district court's discovery order runs afoul of federal privacy regulations and violates important private rights andpublic policies. Therefore, MANDAMUS will issue in 01-1810, and the district court is ordered to enter a new protective order consistent with this opinion. Each party shall bear its own costs in these appeals.

No. 00-4110 REVERSED and REMANDED

No. 01-1810 MANDAMUS ISSUED

FOOTNOTES

/1 The Hektoen Institute for Medical Research, a defendant in this action in the district court, filed a motion for non-involvement in this appeal. The court granted that motion.

/2 Dr. Chandler initially sued Cook County Hospital in addition to these defendants. The hospital was found to have no identity independent of Cook County and was dismissed from the case. See United States ex rel. Chandler v. Hektoen Inst., 35 F. Supp.2d 1078, 1086 (N.D. Ill. 1999).

/3 Sec. 3729 provides:

(a) Any person who--

(1) knowingly presents, or causes to be present-ed, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by get-ting a false or fraudulent claim allowed or paid; . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. sec. 3729(a).

/4 Under Illinois law, Cook County is a "home rule"

unit. Secretary of State of Illinois, Illinois Counties & Incorporated Municipalities 30 (1993); see also Ill. Const. Art. VII sec. 6; Nevitt v. Langfelder, 623 N.E. 2d 281, 285 (Ill. 1993) (noting that Cook County and the City of Chicago are the only home rule units in Illinois with populations in excess of 1 million people). "Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. Art. VII, sec. 6(a). Home rule status is automatically granted to any municipality with a population greater than 25,000 and any county with a chief executive elected by the voters, or any municipality who chooses such status by referendum. Id. The legislature may preempt the taxing power of a home rule unit by a three-fifths vote of both houses. See id. sec. 6(g). The legislature may also preempt, by ordinary majority vote, "any power or function of a home rule unit other than a taxing power" or certain local improvements and special services. Id. sec.sec. 6(h), (l).

/5 There is no reason to presume that a decision by the Justice Department not to assume control of the suit is a commentary on its merits. The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney.

/6 This change shifted the FCA's damages regime from a compensatory system to a punitive one, see Stevens, 529 U.S. at 785-86, thereby implicating municipalities' common-law immunity from punitive damages. See infra sec. II(B).

/7 The Supreme Court in Stevens found that this definition militated against a finding that states were within the definition of "person." See Stevens, 529 U.S. at 784. The court reasoned that if Congress wanted to include states within the ambit of sec. 3729, it could have provided a similar definition within that provision. Id. Given the presumption that States are not included within the definition of "person," "the failure to add States to sec. 3729 suggests that States are not subject to quitam liability under sec. 3729." Id. at 784 n.14. Municipalities and other political subdivisions, however, are presumptively within the meaning of "person." Congress' inclusion of "political subdivision of a State" within sec. 3733's definition of person and its exclusion from sec. 3729's definitions section does not have the same meaning as Congress' similar action with regard to states. We

need not draw the same inference the Supreme Court drew from this aspect of the statute's structure because Cook County does not enjoy the same privilege of place within our constitutional structure enjoyed by states.

/8 The Supreme Court in Stevens found this statement to be erroneous. See Stevens, 529 U.S. at 783 n.12. The committee's error, however, was in presuming that "person" in its broad sense included states which, as Stevens points out, is not the case. Given the sovereign status of states, Congress must do something more to bring states within the coverage of a federal law than enact a law aimed at "persons," even if that term is used in its broadest sense. See id. at 780-81. The same is not true of municipal corporations and other governmental bodies within state boundaries. Therefore, while the committee report was incorrect with respect to the liability of states under the FCA before 1986, we believe it was correct in asserting that political subdivisions of states were, and are, subject to suit under the FCA so long as they are not properly considered arms of the state itself.

/9 The Supreme Court had held that the double damages recoverable before 1986 were remedial. See United States v. Bornstein, 423 U.S. 303, 315 (1976).
/10 Because our holding on this point creates an intercircuit conflict, this opinion has been circulated to the entire court. Circuit Rule 40(e). No judge in active service has requested a vote to hear this case en banc.

/11 Because Cook County is reinstated, we need not consider the County's argument that we have jurisdiction under the doctrine of Dellwood Farms v. Cargill, Inc., 128 F.3d 1122 (7th Cir. 1997). Dellwood held that "[w]hen the [discovery] order is directed against a nonparty, as it is here, he has no appellate remedy at the end of the litigation, so he is allowed to appeal immediately." Id. at 1125.

/12 The regulations provide that:

Disclose or disclosure means a communication of patient identifying information, the affirmative verification of another person's communication of patient identifying information, or the communication of any information from the record of a patient who has been identified.

42 C.F.R. sec. 2.11.