**PHOENIX SOLUTIONS INC., Plaintiff,**

v.

**WELLS FARGO BANK, N.A., and Wells Fargo Funds Management, LLC., Defendants.**

No. C 08–00863 MHP.

United States District Court, N.D. California.

Oct. 22, 2008.

---

Raymond Joseph Trojan, Trojan Law Offices, Beverly Hills, CA, for Plaintiff.

Eugene Morris Paige, Keker & Van Nest, L.L.P., San Francisco, CA, for Defendants.

**MEMORANDUM & ORDER**

MARILYN HALL PATEL, District Judge.

Phoenix Solutions, Inc. ("Phoenix") brought this action against Wells Fargo Bank, N.A. ("Wells Fargo") for infringement of U.S. Patent Nos. 6,633,846, 6,665,640, 7,050,977, and 7,277,854 (collectively, "patents-in-suit") directed to "speech recognition software." During the course of discovery, Phoenix voluntarily produced documents relating to the drafting of the patents-in-suit, including communications between a named inventor and the prosecuting attorney. Phoenix later requested that the prosecuting attorney be permitted access to confidential material under the protective order. Wells Fargo requested that Phoenix produce all documents related to the prosecution of the patents-in-suit, as well as certain "warning" or "cease and desist" letters sent to third parties and Phoenix refused on privilege grounds. Now before the court is the issue of the scope of waiver of attorney-client privilege, the appropriate protective order provisions, and any applicable "settlement" privilege as to the requested documents. Having considered the parties' arguments and briefs, and for the reasons detailed below, the court enters the following memorandum and order. This order serves to memorialize and supplement the court's partial oral ruling on the appropriate scope of waiver during the telephonic conference with the parties on September 11, 2008.

*BACKGROUND*

I. *The Scope of Waiver Issue*

The facts relevant to the instant motion were reviewed in part during the September 11th telephonic conference and therefore, only a summary is necessary here. Several months ago, Phoenix served its Initial Disclosures on Wells Fargo pursuant to Federal Rule of Civil Procedure 26(a). Contained within that production were several drafts of the specification of the patents-in-suit prior to the filing date of the applications in the U.S. Patent and Trademark Office ("USPTO") and several documents reflecting com-

munications between a named inventor on the patents and Phoenix's principal, Dr. Ian Bennett, and J. Nicholas Gross, outside patent counsel, relating to the drafting of the applications prior to filing, which eventually issued as the patents-in-suit. Trojan Dec. Re Scope of Waiver ("First Trojan Dec."), ¶ 2, Exh. 1. The communications included emails discussing the receipt of documents to consider when drafting the patent application, emails discussing drafts and revisions of the specification portion of the application, and comments in the drafts that suggest making reference to certain patents, articles and prior art references. *Id.* at PHO006213–6216, PHO006219–6351.

As a result of that production, Wells Fargo requested that Phoenix produce all such communications between Dr. Bennett and attorney Gross. Joint Case Management Statement 2:17–21. Phoenix refused, on the grounds of attorney-client privilege. *Id.* Wells Fargo now claims that Phoenix has waived the privilege for all communications on the subject matter of the substance of the disclosed documents, including that which relates to: (1) the drafting and editing of the specification of the patents, including the scope and content of the prior art; (2) the inventorship of the patents; (3) the novelty of the patents; (4) how to uncover prior art, (5) how prior art applies to the invention; and (6) how to draft the claims to avoid prior art. *See* First Trojan Dec. ¶ 3, Exh. 2; Maitra Dec., Exh. 5.

Phoenix argues that Wells Fargo's request should be denied because it is overly broad and seeks waiver for documents that are clearly privileged and outside the scope of any subject matter waiver of such privilege. Specifically, Phoenix contends that attorney-client communications after the filing date of the patent applications that issued as the patents-in-suit and drafts of the patent claims (either pre-filing drafts of claims or post-filing claim amendments made during prosecution) are outside the scope of any subject matter waiver based on the original production of communications that predated the filing of the patent applications. Phoenix contends that the scope of waiver should be limited to documents that relate to the draft-

ing and editing of the specification of the patents-in-suit and related communications that deal with matters prior to the filing of the patent applications. Wells Fargo disagrees with any proposed temporal limitation to the subject matter waiver. Maitra Dec., Exhs. 5–7.

## II. *The Protective Order Issue*

A second issue raised by Wells Fargo during the September 11, 2008 telephonic conference concerns the terms of a stipulated protective order. The parties have come to an impasse on one provision of a protective order proposed by Wells Fargo and request court intervention. During negotiations of a stipulated protective order, Phoenix requested that its outside patent prosecution counsel be granted access to all information, including "attorney's eyes only" highly confidential information. Joint Case Management Statement 1:18–20. Gross has been Phoenix's only counsel on patent matters for the past nine years: he prosecuted the four patents-in-suit as well as other related patents and he continues to prosecute continuation applications of the patents-in-suit. *Id.*, 1:20–21, 26–28; Gross Dec. ¶ 2; Paige Dec. Re Protective Order ("First Paige Dec.") ¶¶ 2–3.

Phoenix's position is that Gross' input is needed to provide assistance in making strategic decisions about this litigation. Gross Dec. ¶ 4. Phoenix asserts that it would be greatly prejudiced if denied the ability to meaningfully rely on the service of its sole patent prosecutor. Bennett Dec. ¶ 3. Phoenix contends that Wells Fargo would not be prejudiced because it purportedly has no intellectual property in the area of speech recognition that could be compromised by Gross' involvement and that Wells Fargo's ability to compete in the banking industry would not be impacted by granting Gross access to its confidential information in this case. *See* Trojan Dec. Re Protective Order ("Second Trojan Dec."), Exh. 2; Gross Dec. ¶ 5.

Wells Fargo opposes Phoenix's request and argues that the protective order should have a prosecution bar. Wells Fargo asserts that Gross performs the functions that an in-house patent prosecution counsel would perform for Phoenix. First Paige Dec., Exh. A

at 3:5–12, 5:12–17. Wells Fargo also asserts that Gross has written several letters to Wells Fargo seeking to induce Wells Fargo to take a license to the Phoenix patents and stating that several of Phoenix's pending patent applications appear to have claims that read upon the system Wells Fargo uses. *Id.*, Exh. B at 3. Wells Fargo's position is that Phoenix should not be granted access to confidential information about its system that Gross could use in his continued prosecution of Phoenix patents, e.g., to try to draft claims in pending patent applications expressly to cover Wells Fargo's system, so as to assert future Phoenix patents against Wells Fargo. Wells Fargo indicated that it would be willing to allow Gross access to the requested documents if Gross agreed to cease prosecuting patents for Phoenix during the litigation and for a period of one year thereafter. Joint Case Management Statement 2:14–16; Def.'s Brief on Appropriate Protective Order Provisions 7:2–5; Second Trojan Dec., Exh. 1.

### III. *The "Settlement" Privilege Issue*

Wells Fargo initially raised a supplemental issue in its scope of waiver brief concerning the nondisclosure and asserted privilege by Phoenix relating to communications between Phoenix and various third parties, namely, communications accusing third parties of infringing the patents-in-suit. *See* Maitra Dec., Exh. 3. Wells Fargo does not believe there is any basis to exclude such "dunning letters" or "cease and desist letters" from production and requested that the court order that Phoenix turn over such documents, as well as all documents with third-party companies relating to license negotiations concerning the patents-in-suit, including Phoenix's stipulation with Intervoice, Inc. ("Intervoice") in the related *Phoenix v. Sony* case, 3:07–cv–002112–MHP. During the September 11, 2008 telephonic conference with the parties, the court ordered that

Phoenix turn over the initial letters, along with a privilege log and requested that the parties brief the issue with respect to other documents.

Shortly thereafter, Phoenix timely produced a privilege log to Wells Fargo. Paige Dec. Re Settlement Privilege ("Second Paige Dec.") ¶ 5, Exh. 4. Phoenix also timely produced various letters to third parties reflecting offers to license certain of Phoenix's patents. *Id.*, ¶¶ 6–7, Exh. 5. Wells Fargo asserted that Phoenix should disclose all other communications between Phoenix and third parties relating to Phoenix's enforcement of the patents-in-suit currently listed as privileged in Phoenix's log, including all aforementioned responsive communications with Intervoice. Wells Fargo contends that all of the withheld documents that share the same privilege log description of "letter re: license offer" or "email re: license offer" with the asserted privilege of "settlement" should be ordered disclosed, barring any evidence that any of the withheld documents differ from the already produced invitations to negotiate.[1]

Phoenix states that it is in negotiations with over thirty companies regarding license offers related to the patents-in-suit. Trojan Dec. Re Settlement Privilege ("Third Trojan Dec.") ¶ 2, Exh. 1. Phoenix states that it has already produced the only license agreement relating to its patents-in-suit, signed by Sony. *Id.*, ¶ 3. Phoenix draws a distinction between license/settlement agreements and settlement negotiations, and asserts that documents relating to the negotiations of settlement do not impact on substantive patent issues and have no probative value. Phoenix asserts that it need only produce the license agreements from the cases it has settled and that it has no obligation to disclose communications from any other third parties prior to reaching an agreement and signing a license with such parties. Third Trojan Dec. ¶ 3.

---

1. In its supplemental brief on Phoenix's "settlement" privilege claim, Wells Fargo amended its argument to reflect Phoenix's updated privilege log. Wells Fargo still contends that all of the withheld documents with the amended privilege log descriptions of "infringement contentions," "presentation re: license offer" and "chart re: license offer" should still be ordered disclosed because they are not privileged and relevant to this litigation. The court was not moved by Wells Fargo's original objections to the privilege log descriptions supplied by Phoenix and likewise fails to find the supplemental objections of much consequence, but they are so noted nonetheless.

Phoenix's position is that all documents relating to settlement negotiations are: (1) protected from discovery based on a "settlement privilege," whose policy is embodied in Federal Rule of Evidence 408; and (2) generally not relevant to other litigation because any positions taken by the parties prior to any final agreement are insignificant and intrusive and will likely not constitute admissible evidence.

*LEGAL STANDARD*

I. *Scope of Discovery*

■ "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ." Fed.R.Civ.P. 26(b)(1). The Rule goes on to state that "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The scope of discovery permissible under Rule 26 should be liberally construed; the rule contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case. *Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 237 F.R.D. 618, 621 (N.D.Cal.2006) (Patel, J.). However, the broad scope of permissible discovery is limited by any relevant privileges, including the attorney-client privilege. *See* Fed.R.Civ.P. 26(b)(1). Any proposed privilege must promote a public interest that is "sufficiently important . . . to outweigh the need for probative evidence." *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). The recognition of a privilege should be judged on a case-by-case basis and weighed against the public interest. *Jaffee v. Redmond*, 518 U.S. 1, 8, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).

■ The scope of discovery is also constrained by Rule 26(c), which explicitly authorizes the district court to protect parties from "undue burden or expense" in discovery by ordering "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Fed.R.Civ.P. 26(c)(7). To obtain a protective order, the party resisting discovery or seeking limitations must show "good cause" for its issuance. Fed.R.Civ.P. 26(c). The burden of demonstrating the need for protection from discovery is placed on the party seeking a protective order, not on the party opposing the order. *Id.*

II. *Attorney–Client Privilege*

■ Confidential information disclosed by a client to an attorney to obtain legal assistance is protected by the attorney-client privilege. *Fisher v. U.S.*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *American Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 745 (Fed.Cir.1987). An attorney's communications to a client may also be protected by the privilege, to the extent that they contain or are based on confidential information provided by the client, or legal advice or opinions of the attorney. *U.S. v. Margolis*, 557 F.2d 209, 211 (9th Cir.1977). The purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). As a general matter, "[a] party is not entitled to discovery of information protected by the attorney-client privilege." *Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir.2003), citing *Wharton v. Calderon*, 127 F.3d 1201, 1205 (9th Cir.1997).

■ The attorney-client privilege is not absolute. It may be waived "either implicitly, by placing privileged matters in controversy, or explicitly, by turning over privileged documents." *Gomez v. Vernon*, 255 F.3d 1118, 1131 (9th Cir.), *cert. denied, Beauclair v. Puente Gomez*, 534 U.S. 1066, 122 S.Ct. 667, 151 L.Ed.2d 581 (2001). "The doctrine of waiver of the attorney-client privilege is rooted in notions of fundamental fairness." *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340 (9th Cir.1996). "Its principal purpose is to protect against the

unfairness that would result from a privilege holder selectively disclosing privileged communications to an adversary, revealing those that support the cause while claiming the shelter of the privilege to avoid disclosing those that are less favorable." *Id.* at 340–41 (citing 8 J. Wigmore, *Evidence* § 2327, at 636 (McNaughton rev.1961)). The disclosure of confidential information resulting in the waiver of the attorney-client privilege constitutes waiver of privilege as to communications relating to the subject matter that has been put at issue. *See Winbond Electronics Corp. v. Int'l Trade Comm'n,* 262 F.3d 1363, 1376 (Fed.Cir.2001).

### III. *Scope of Waiver*

 When either privilege is waived, its scope extends to "all communications on the same subject matter ... so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not." *Stanford v. Roche,* 237 F.R.D. 618, 625 (N.D.Cal.2006) (Patel, J.). This court has further stated that "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." *Id.* The burden of establishing the existence of the privilege remains on the person asserting it. *See In re Grand Jury Investigation No. 83–2–35,* 723 F.2d 447, 450 (6th Cir.1983) (collecting citations).

### *DISCUSSION*

### I. *Scope of Waiver*

 Wells Fargo seeks the following categories of documents, relating to the subject matter of: (1) editing and drafting of the specification of the patents, including the scope and content of the prior art; (2) inventorship of the patents; (3) novelty and/or innovation of the patents; (4) how to uncover prior art; (5) how prior art applies to the invention; and (6) how to draft the claims to avoid prior art.

 Phoenix acknowledges that it produced the original documents, i.e., drafts of patent applications and related communications, voluntarily and not inadvertently and that attorney-client privilege as to those documents had been waived as a result. The court appreciates that the parties are in agreement that the voluntary disclosure of the attorney communication constituted a waiver of the privilege as to all other such communications on the same subject matter. This is, of course, black letter law. However, Phoenix disputes the scope of the subject matter waiver, arguing that it was narrowly constrained to those documents that had already been produced and those documents alone. Phoenix asserts that Federal Circuit law controls a determination of the proper scope of waiver. Indeed, because drafts of patent applications and communications relating to the preparation of filing patent applications concern discovery issues that occur in the unique context of patent litigation, the court finds that Federal Circuit law appropriately applies to the scope of waiver of this particular subject matter. *See In re EchoStar Communs. Corp.,* 448 F.3d 1294, 1298 (Fed.Cir.2006). However, the issue of waiver itself and the scope of that waiver as it applies to other documents does not fall exclusively in the realm of patent law and therefore the court will consider Ninth Circuit law for that determination. *See GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1272 (Fed.Cir.2001) (holding that waiver of privileged information is not a substantive patent issue and regional circuit law applies).

Wells Fargo argues that Phoenix has attempted to use the disclosed drafts and other documents as both a shield and a sword, that is, to reveal a limited aspect of privileged communications in order to gain a tactical advantage in litigation. If this were the case, Phoenix would have broadly waived the privilege as to all other communications relating to the same subject. *See, e.g., Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1351 (Fed.Cir.2005), citing *In re Grand Jury Proceedings,* 78 F.3d 251, 255 (6th Cir.1996) and *Matter of Continental Illinois Securities Litigation,* 732 F.2d 1302, 1314 n. 18 (7th Cir. 1984). However, it is not apparent on these facts that Phoenix made the initial disclosures to obtain any advantage or that such

disclosure has advantaged Phoenix in any manner. Moreover, the authorities on which Wells Fargo relies only confirm the general premise that the waiver applies to the rest of the communications on the same subject matter; they do not define the scope of the subject matter, which is the issue at hand.

■ Phoenix's attorney argument that it did not subjectively intend to waive the privilege as to any documents beyond those which have been already disclosed is unpersuasive to make out the necessary element of non-waiver. It is well settled that a party's failure to protect its privilege can result in a loss or conscription of that privilege. *Fort James Corp.*, 412 F.3d at 1351, citing *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir.1997). This court finds the objective fact that Phoenix voluntarily disclosed certain drafts of patent applications dispositive in determining that there has been a subject matter waiver as to all drafts of those patent applications. *See id.*, citing *In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir.1988) (stating that "if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as 'the details underlying the data which was to be published' will not enjoy the privilege"). Phoenix's assertions that: (1) it had already produced all written communications relating to the drafting of the written description and (2) "it is clear from the documents produced that Phoenix made no attempt to conceal unfavorable documents" are inadequate. *See* Pl.'s Brief Re Scope of Waiver at 4. Phoenix has already produced pre-filing drafts of the written description portions of the patents-in-suit, not just communications relating to those drafts. Accordingly, Phoenix must produce all drafts of those applications, irrespective of whether they contain additional written comments on them. This includes all drafted and edited (e.g., red-lined) portions of the patent specification, including the background section, the summary of the invention, the figure legends and the detailed description section, up to the date of filing the patent application(s) with the USPTO. Because Phoenix's voluntary production was limited to the specification portion of the applications which contained no patent claims, however, the court will not order Phoenix to produce any pre-filing drafts of the claims themselves.

Phoenix must also produce all written communications relating to the drafting of the patents-in-suit. The court is unclear as to the intended impact of Phoenix's position that it has already produced all of its pre-filing communications since "most of the information found in the communications was already disclosed to the public in the patent application." *Id.* at 4:4–5. If this statement is Phoenix' way of attempting to circumvent the production of the actual e-mails between the prosecuting attorney and the inventor concerning the drafts, it is unacceptable. The court knows of no authority supporting Phoenix' proposition made during the September 11 telephonic conference that drafts of patent applications become part of the public record when a patent application is filed. *See* Transcript of Proceedings, Docket No. 82 ("Tr."), at 9:5–7. Accordingly, the court finds it necessary to make clear that those drafts must be produced because of a waiver of the attorney-client privilege in this case and not any alleged and ill-founded public disclosure requirement.

The court likewise fails to comprehend Phoenix's nonsensical argument that the already produced documents make clear that Phoenix has not attempted to conceal unfavorable documents. One action does not speak to the other, unless Phoenix is trying to make an admission that it considers the already disclosed documents to be harmful to Phoenix, which the court doubts. However, neither does the court agree with the other end of the spectrum, asserted by Wells Fargo, that Phoenix's disclosure of the specification drafts without the claim drafts shows that Phoenix has chosen to produce only those communications that favor Phoenix.[2] To reiterate, the court does not find, on these facts, that Phoenix made the initial disclo-

---

2. Indeed, Phoenix said in so many words during the September 11, 2008 telephonic hearing that the voluntary disclosure of the patent application drafts was "probably bad lawyering." *See* Tr. 10:5–9.

sures to obtain any benefit or that such disclosure has benefitted or will benefit Phoenix in this litigation and will not extend the scope of waiver on that basis.

 In addition to patent application drafts, the court finds that Phoenix's voluntary disclosure of communications between the inventor Bennett and the patent prosecutor Gross discussing specific references waived the attorney-client privilege by placing those communications at issue in this litigation. The voluntarily produced communications refer to the prior art and the relevance of the prior art to specific portions of the specification of the patents-in-suit. *See, e.g.,* First Trojan Dec., Exh. 1 at PHO006274 ("Here we might mention Dragon, Via–Voice, etc.") and PHO006274 ("Here we should talk about Qualcomm and GTE prior art on distributed processing."). Given those prior disclosures, it would be unreasonable for counsel to have reasonably expected that subsequent communications *concerning those specific references* would be assumed to have remained in confidence. *See, e.g., Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 24–25 (9th Cir.1981) (explaining the general principle that disclosure does not necessarily amount to waiver of the privilege but it does extinguish the element of confidentiality that one must show in order to claim the privilege). The court finds that the subject matter waiver, in terms of a loss of expected confidentiality, reasonably extends to all further documents or communications between the named inventor and the prosecuting attorney pre- and post-filing, i.e., throughout the prosecution of the patent applications, concerning any of the prior art documents specifically identified by name in the previously disclosed documents. This waiver extends to all references that are discussed or mentioned in patent application drafts or other communications between Dr. Bennett and Gross. The mention need not qualify as a substantive discussion of that prior art for the waiver to apply; a mere listing of the document by name in a sentence is enough to waive that communication and any direct responses thereto. However, if said references were named merely by being listed as an attachment to a written communication and are not discussed else-

where in the communication, the waiver does not extend to those communications or attachments.

 Aside from specifically named references, the subject matter waiver is of limited temporal nature. The court is mindful that too broad an application of the rule of waiver requiring unlimited disclosure could very well destroy the purpose of the privilege itself. *See, e.g., Weil,* 647 F.2d at 25 (finding waiver "only as to communications about the matter actually disclosed"). The court will not hold the waiver to extend to all communications relating to prior art references between the inventor and the attorney. At issue, therefore, is the temporal scope of the partial waiver. The court finds it is a reasonable belief that the disclosure of communications and documents related to the prosecution of the patents-in-suit between the inventor and the attorney be made within the confines of the attorney-client relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence. Accordingly, Phoenix did not waive any privilege with respect to post-filing materials, including communications regarding the prosecution of the patent applications, analysis of the rejections by the Examiner, strategies for claim amendments, drafts of actual claim amendments and related arguments, etc. Although such documents may well be at the heart of one of the disputes between the parties, as Wells Fargo contends, that fact is not dispositive. There is a fundamental divide between patent drafting and patent prosecution that cannot reasonably be bridged by the extension of a waiver, at least on the facts in this case.

 With respect to the other categories of documents for which Wells Fargo asserts the privilege has been waived, the court does not find waiver as to any documents that specifically relate to the inventorship of the patents or the novelty and/or innovation of the patents. The court does find a waiver, however, of documents relating to general methodology for uncovering prior art and processes for searching and discovering prior art and how to draft the claims to avoid prior

art, based on the voluntary disclosure of documents relating to this subject matter. *See, e.g.,* First Trojan Dec., Exh. 1 at PHO006215. This waiver does not open the door, however, to substantive discussions of how a particular prior art reference applies to the invention unless that specific reference has been identified by name, and then all communications regarding that prior art reference must be disclosed.

In summary, the court finds that Phoenix did not waive any privilege with respect to either pre- or post-filing drafts of the claims themselves, nor did Phoenix waive any privilege with respect to post-filing strategy and analysis regarding the prosecution of those claims, except for specific instances in which the previously disclosed named prior art is discussed or referenced. The court hereby orders Phoenix to produce all responsive documents within the scope of the waiver so defined.

## II. *Protective Order*

 Rule 26(c) of the Federal Rules of Civil Procedure governs protective orders. In the Ninth Circuit, issues concerning the scope of protective orders for confidential information entails a balancing test of the conflicting interests between the protection of Rule 26(c) and the broad mandate of the admissibility of information in discovery conferred by Rule 26(b)(1) of the Federal Rules of Civil Procedure. *See, e.g., Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1472 (9th Cir.1992), *cert. denied,* 506 U.S. 869, 113 S.Ct. 198, 121 L.Ed.2d 141 (1992) (holding that courts must balance the risk of inadvertent disclosure of trade secrets to competitors against the risk that the protection of such confidential information will impair prosecution of plaintiff's claims). In this case, Phoenix argues that denying its prosecution counsel from access to documents designated as highly confidential under the terms of the protective order will greatly hinder Phoenix's ability to prosecute its claims. Phoenix contends that granting its prosecution counsel access to confidential information will not compromise Wells Fargo's competitive advantage because the parties are not in direct competition in any industry

related to the patents-in-suit. Phoenix further argues that because Wells Fargo has not asserted any proprietary position, in terms of having its own patents in the area of speech recognition, it is highly unlikely that any confidential information accessed by Gross would be usable by Gross to harm Wells Fargo. *See* Trojan Dec., Exh. 2; Gross Dec. ¶ 5.

Setting aside the issue of prejudice to Phoenix for the moment, the court first considers the substantive argument that Wells Fargo essentially has no basis for asserting the protective order against Phoenix's outside prosecution counsel. This argument fails to withstand scrutiny for a number of reasons. First, because Gross is currently involved in prosecuting continuation applications of the patents-in-suit, the court finds it unrealistic to expect Gross to be able to wholly compartmentalize his knowledge of Wells Fargo's confidential information and not let it influence his current and ongoing prosecution duties to Phoenix. To hold otherwise would place Gross in the "untenable position" of having to limit his counsel to his client with respect to ongoing prosecution strategies lest he improperly or indirectly reveal information obtained from Wells Fargo concerning its alleged infringement of the patents-in-suit. *See Brown Bag,* 960 F.2d at 1471.

Second, the fact that Wells Fargo and Phoenix are not direct competitors hardly forecloses the inquiry. Phoenix's allegation that Wells Fargo does not make or sell speech recognition systems awkwardly sidesteps the fact that Wells Fargo uses speech recognition systems. It is for this very reason that Wells Fargo has been brought to the table in this litigation. Thus, the very fact that Wells Fargo is being sued by Phoenix for infringement of the patents-in-suit indicates that Phoenix believes the parties have at least some overlapping interest in the same industry. This belief, be it meritorious or not, is one that could certainly affect the competitive nature of Wells Fargo's business, as discussed further below. At a minimum, the court finds that Wells Fargo's concern that Gross could use the knowledge gained in this litigation to prosecute future related pat-

ents to Wells Fargo's disadvantage is valid and deserving of protection.

Phoenix's reliance on *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed.Cir.1984) to conclude that there is no automatic exclusion of prosecution counsel from assisting in the litigation of a prosecution client serves to set up a straw man. In *U.S. Steel*, the Supreme Court concluded that a court should examine the factual circumstances of any counsel's relationship, outside and in-house counsel alike, to the party demanding access. *Id.* at 1468. Wells Fargo never sought to disqualify Phoenix's prosecution counsel from an active role in this litigation as a matter of course. Wells Fargo's brief explicitly stated that it was *not* advocating a *per se* bar on patent prosecutors assisting with litigation but rather a selective and specific bar based on the factual circumstances surrounding Gross' involvement with Phoenix in the relevant field of the present litigation and his continued prosecution of patents claiming priority and benefit from the patents-in-suit, all of which is consistent with the case law cited by Phoenix.[3]

Furthermore, a crucial factor in the *U.S. Steel* case was whether in-house counsel was involved in "competitive decision-making;" which the Court explained meant advising on business decisions "made in light of similar or corresponding information about a competitor." *Id.* at 1468 n. 3. In this case, Wells Fargo's concern is that Gross' ongoing involvement in the prosecution of continuation applications of the patents-in-suit leave open the door to permitting him to tailor the claims in the continuation applications to cover specific, known activities that are revealed to him through the course of discovery in this litigation. The court is well aware that continuation applications allow patentees and their prosecution counsel the opportunity to monitor the marketplace and respond by drafting and prosecuting claims that cover discovered activities. In this vein, several courts have concluded that patent prosecution is, by its very nature, a form of competi-

tive decision-making because patent attorneys can control the nature and scope of a patented invention. *See, e.g., In re Papst Licensing*, 2000 WL 554219, *3 (E.D.La. 2000); *Mikohn Gaming Corp. v. Acres Gaming Inc.*, 50 U.S.P.Q.2d 1783, 1784 (D.Nev. 1998). Other courts have extended the conclusion to hold that patent counseling is also a form of competitive decision-making if it relates broadly to the scope of a patented invention. *See, e.g., Chan v. Intuit, Inc.*, 218 F.R.D. 659, 661–662 (N.D.Cal.2003) ("if advice related to patent prosecution is defined as competitive decision-making ... then advice on the scope of patent claims must also be defined as competitive decision-making.").

Based on the foregoing logic, the court finds that Gross is indubitably involved in the sort of decision-making that disqualifies him from having access to Wells Fargo's confidential information. This inquiry is far simpler on the present facts than in cases that grapple with the risk of inadvertent disclosure, such as *Brown Bag* and *Mikohn*. Here, the court need not consider how realistic it may or may not be to expect the prosecutor's knowledge of the defendant's technology will not influence his current and ongoing prosecution duties to his client, because of Phoenix's explicit acts. Phoenix has already crossed the line and used Gross for more than just patent prosecution in this case—Gross wrote several letters to Wells Fargo seeking to induce Wells Fargo to take a license to the Phoenix patents, stating that "[s]everal of [Phoenix's] *pending* publications also appear to have claims which read on your system ...". *See* First Paige Dec., Exh. B at 3. Pending publications contain patent claims that are in the midst of prosecution and can be amended at any time up until patent issuance. Phoenix has effectively stipulated that it is trying to get future issued claims that read upon the technology used by Wells Fargo. Under these circumstances, the court finds disingenuous Phoenix's argument that *Brown Bag* and other cases relied on by Wells Fargo are inapposite

---

**3.** The only other appellate decision on which Phoenix relies to argue that a patent attorney is not involved in competitive decision-making is *In re Sibia Neurosciences, Inc.*, 1997 WL 688174 (Fed.Cir.1997) (unpublished). Because the Fed-

eral Circuit deemed its opinion unsuitable for publication, this court has not considered it and finds improper Phoenix's contention that any "rationale established by the Federal Circuit" in *Sibia* controls the instant inquiry.

because they involve direct competitors, where the fear of inadvertent disclosure is warranted. Gross' letters provide a formal and explicit written assurance that the fear of disclosure is warranted in this case and so the case law applies.

 Having determined that Wells Fargo has a valid risk of harm concerning the disclosure of its confidential information to Phoenix, the court must now balance this against the risk that the protection of such confidential information will impair the prosecution of Phoenix's claims. Phoenix argues that such terms would effectively preclude Gross from assisting Phoenix with this litigation and Phoenix asserts it would be greatly prejudiced if denied the ability to rely on the service of its only patent prosecution attorney for the remainder of the case. Phoenix counters that Wells Fargo would not suffer anything more than minor or speculative harm because the parties are not in direct competition and whatever information Gross receives could not be used for anticompetitive purposes to harm Wells Fargo. Phoenix further argues that because Wells Fargo has not asserted any proprietary position, in terms of having its own patents in the area of speech recognition, it is highly unlikely that any confidential information accessed by Gross would be usable by Gross to harm Wells Fargo.

The court is not persuaded by any of these arguments. The case law requires restricting Gross' access to confidential information in this litigation. Moreover, Phoenix has put itself in harms way by using Gross for more than patent prosecution already. This is not a case that hinges on the extent of good faith Gross might exercise in parceling out his knowledge of Wells Fargo's secret technology from his prosecution and related counseling duties to Phoenix. Pandora's Box has already been opened and Phoenix cannot continue to rely on Gross in the manner to which it has been come accustomed. The court finds the potential harm to Wells Fargo from inadvertent or advertent disclosure of its confidential information outweighs the hardship that would befall Phoenix if its prosecution counsel were disqualified or restricted to some extent in this case.

The court leaves the choice to Phoenix. If it wishes to continue to retain the services of Gross as patent prosecution counsel, a prosecution bar must be inserted in the protective order. However, if Phoenix firmly believes it would be unduly depriving itself of the ability to press its claims in this litigation without the assistance of Gross, Phoenix has the option to have Gross cease prosecuting patents for Phoenix during the litigation and for a period of one year thereafter, as has been proposed by Wells Fargo. The court finds this length of time reasonable and its subject matter scope appropriate given the size of the company and the related field of Phoenix's other patents and patent applications. *See, e.g., Chan,* 218 F.R.D. at 662 (limiting bar to prosecution activities for counsel receiving confidential information until two years after trial); *Interactive Coupon Marketing Group, Inc. v. H.O.T! Coupons, L.L.C.,* 1999 WL 618969 at *4 (N.D.Ill.1999) (limiting prosecution bar until one year after conclusion of the litigation); *Davis v. AT&T Corp.,* 1998 WL 912012 at *3 (W.D.N.Y.1998) (limiting bar to prosecuting patents in the subject field until two years after termination of the litigation); *Medtronic, Inc. v. Guidant Corp.,* 2001 WL 34784493 at *5 (D.Minn. 2001) (limiting prosecution bar for one year).

### III. *Settlement Privilege*

 Phoenix has produced to Wells Fargo over thirty letters Phoenix sent to third-party companies reflecting initial offers to license certain of Phoenix's patents. Phoenix asserts that it is currently engaged in licensing negotiations with several of those companies and has refused to produce further documentation relating to settlement discussions. Wells Fargo seeks to compel production of all of Phoenix's communications with the third-party companies relating to license/settlement negotiations concerning the patents-in-suit, including documents relating to Phoenix's enforcement of the patents-in-suit that are currently listed as privileged in Phoenix's privilege log as well as responsive communications relating to Phoenix's stipulation with Intervoice, which are not logged. Phoenix contends that the information sought is not

discoverable because it is protected under a settlement privilege.

The scope of discovery permitted by the Federal Rules of Civil Procedure is very broad. *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Discovery is only limited to information that is not privileged and that is relevant to the claim or defense of any party. Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Phoenix argues that the information sought by Wells Fargo is both privileged and not relevant to this litigation. Phoenix's position is that it has no obligation to disclose communications from any other third parties prior to reaching an agreement and signing a license with such parties, because all documents relating to settlement negotiations are: (1) protected from discovery based on a "settlement privilege," whose policy is embodied in Federal Rule of Evidence 408; and (2) generally not relevant to other litigation because any positions taken by the parties prior to any final agreement are insignificant and intrusive and will likely not constitute admissible evidence. Because the issue of relevance is a simpler one in this case, the court addresses Phoenix's arguments in reverse order.

## A. *Relevance*

Phoenix draws a distinction between license/settlement agreements and settlement negotiations, and asserts that documents relating to the negotiations of settlement do not impact on substantive patent issues and have no probative value. Wells Fargo disagrees, arguing that Phoenix's correspondences with third parties that it has accused of infringement and made offers to license its patents are relevant because they could be material to several aspects of the merits of this case. Specifically, Wells Fargo argues that Phoenix's communications are relevant to show what Phoenix believes infringes the patents-in-suit, what Phoenix would consider a reasonable royalty rate for the patents-in-suit, and that third-party responsive communications could potentially reveal evidence of prior art systems that existed before Phoenix filed its patents. In its supplemental brief Wells Fargo also argues that Phoenix's communications could also possibly contain admissions against interest if Phoenix makes infringement assertions to third parties in a manner that contradicts its assertions in this litigation.

Based on the record at hand, the court is hard pressed to conclude that the information sought by Wells Fargo is not reasonably calculated to lead to the discovery of admissible evidence and, hence, is irrelevant to the litigation. There are a multitude of ways in which Phoenix's correspondences with third parties related to license negotiations could be relevant to this litigation, as so noted by Wells Fargo. Fundamentally, the third-party negotiations could help Wells Fargo ascertain the extent of its liability to Phoenix and to formulate an appropriate litigation strategy. This court is not persuaded by Phoenix's arguments that licensing or settlement negotiations themselves are not relevant because the final agreement reflects the culmination of the negotiations and that positions taken by the parties prior to reaching a final agreement are therefore insignificant. Nothing in the record before the court suggests that the information contained in negotiation communications would be duplicative or cumulative of other discovery that Phoenix has already provided to Wells Fargo. Indeed, Phoenix admits it has only reached a final agreement with one party. What is more, Phoenix's position fails to acknowledge that licensing and infringement positions may be taken and discarded or otherwise changed over time based on a myriad of extrinsic factors that could well be relevant to another party accused of infringement. *See, e.g., In Georgia-Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970) (including as evidentiary facts relevant in royalty determinations for patent licenses the patentee's marketing program to maintain his monopoly, the royalties received by the patentee from other licensees and the non-exclusive bounds of the license).

■ Phoenix appears to be conflating the standard for relevance as a discovery threshold with the standard for the admissibility of evidence at trial. "Relevancy for discovery

is flexible and has a broader meaning than admissibility at trial." *See Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890, 903 (7th Cir. 1981). The court considers this further in its privilege analysis, below. But, even if the third-party negotiations addressing the amount of liability were to be protected by a privilege, the court is still unwilling to close the door to the reasonable possibility that admissible evidence will be generated by the dissemination of third-party licensing/settlement negotiations. *See, e.g., U.S. v. American Soc. of Composers, Authors and Publishers*, 1996 WL 157523, *2 (S.D.N.Y.1996) (noting the extensive use at trial of documents concerning past fee negotiations and finding such third-party information "potentially relevant under the liberally read standards of Fed.R.Civ.P. 26(b) (1)"). The court need not determine at this time whether the evidence will actually end up being admissible in this litigation. *See Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, 2007 WL 4166030, *3 (N.D.Cal.2007) ("The question before the Court today is the discoverability, not the admissibility, of the settlement agreement.") This court finds that, at a minimum, discovery of licensing/settlement negotiations is reasonably calculated to lead to relevant, admissible evidence. Accordingly, the requested documents are discoverable so long as they are not privileged.

### B. *Privilege*

▮▮▮ The court disagrees with Phoenix's contention that Federal Circuit law controls this inquiry. Because this discovery issue is not one that occurs in the unique context of patent litigation, and because settlement discussions are themselves not a substantive patent law issue, the court finds that the law of the Ninth Circuit sets the standard to evaluate the adequacy of the asserted privilege. *See, e.g., Dorf & Stanton Communs., Inc. v. Molson Breweries*, 100 F.3d 919, 922 (Fed.Cir.1996) ("Because an order compelling discovery is not unique to patent

law, we agree that [regional circuit] law must be considered."). Phoenix's admission that settlement negotiations themselves "do not impact on substantive patent issues" corroborates this finding. Pl.'s Brief Re Settlement Privilege 3:27–4:1.

▮▮▮ In the Ninth Circuit, a broad scope of discovery is favored because "wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for truth." *Epstein v. MCA, Inc.*, 54 F.3d 1422, 1423 (9th Cir.1995). According to Phoenix, several courts have held that negotiations leading up to settlement are not discoverable, the rationale being that allowing disclosure could chill settlement negotiations and ultimately settlement. Phoenix argues that under the "settlement privilege," parties in negotiation should be allowed to engage in an open discussion without fear that the negotiations will be discoverable. Phoenix's argument, essentially, is that the settlement negotiations are presumptively inadmissible at trial under Rule 408 of the Federal Rules of Evidence.[4] However, the cases on which Phoenix relies are distinguishable from the instant case involving third-party patent license negotiations, in that they involve situations where the parties held a legitimate and explicit expectation that the settlement documents would remain confidential. *See, e.g., Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 978 (6th Cir.2003) (holding privileged settlement negotiations that occurred under a confidentiality order); *Abbott Diabetes Care*, 2007 WL 4166030 at *1 (holding that portions of a settlement agreement could be redacted to preserve the parties' expectation of confidentiality); *American Soc. of Composers*, 1996 WL 157523 at *2 (holding that third-party license negotiating statements must be produced but could be partially redacted to address the confidentiality expectations of all parties and third-party concerns about the context of disclosure in another action). A bilateral (or multilateral) expectation of confidentiality is what forms the es-

---

4. At least one of the cases on which Phoenix relies considers a settlement privilege under Rule 501 of the Federal Rules of Evidence, which authorizes the federal courts to determine new privileges by examining "common law principles

... in the light of reason and experience." Fed. R.Evid. 501. However, because Phoenix did not explicitly raise this basis for a privilege in its brief, the court will not consider the alleged privilege on that catchall basis.

sential basis of the pro-settlement policies underlying Rule 408 and is currently absent from the present record involving licensing negotiations with third-party companies.

Rule 408 of the Federal Rules of Evidence states that evidence of statements made in compromise negotiations are "not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction . . . ." Fed.R.Evid. 408(a). The prohibition on using compromise negotiations is therefore limited and the rule does not bar the admission of such negotiations for other permissible purposes. Indeed, subdivision (b) of the rule provides that "[t]his rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a)" and thereafter provides examples of various permitted uses, including proving a witness's bias or prejudice and negating a contention of undue delay. Fed.R.Evid. 408(b). Thus, at least some communications made in furtherance of licensing/settlement negotiations are discoverable, as Rule 408 permits their use in some aspects of trial.

The court recognizes the right of parties to contract for confidential settlement terms and the important policies underlying Federal Rule of Evidence 408 to encourage settlement. However, Rule 408 does not warrant protecting settlement negotiations from discovery. On its face, the rule applies to the admissibility of evidence at trial, not to whether evidence is discoverable. *See, e.g., Morse/Diesel, Inc. v. Fidelity and Deposit Co.*, 122 F.R.D. 447, 449 (S.D.N.Y.1988) (holding that Rule 408 only applies to the admissibility of evidence at trial and does not protect such evidence from discovery). Even the cases Phoenix cites acknowledge this basic distinction. *See, e.g., American Soc. of Composers*, 1996 WL 157523 at *1 ("The rule limits the admissibility of settlement terms or proposals and of other representations made in the course of settlement discussions, but it does not purport to preclude discovery of such agreements or statements.")

The Advisory Committee Notes to Rule 408 explain that "evidence, such as documents, is not rendered inadmissible merely because it is presented in the course of compromise negotiations if the evidence is otherwise discoverable. A party should not be able to immunize from admissibility documents otherwise discoverable merely by offering them in a compromise negotiation." *See* Fed.R.Evid. 408, advisory committee's note. Moreover, evidence of facts disclosed during compromise negotiations is not inadmissible by virtue of having been first disclosed in the compromise negotiations. Accordingly, facts regarding the very occurrence of Phoenix's threats to third parties are not inadmissible, nor is the substance of settlement discussions *per se* irrelevant to a proceeding in federal court, because Rule 408 itself authorizes the admission into evidence of such materials except for limited purposes. Indeed, courts have reasoned that Rule 408 "does not require any special restriction on Rule 26 because discovery rules do not affect admissibility." *Bank Brussels Lambert v. Chase Manhattan Bank*, 1996 WL 71507, *3 (S.D.N.Y.1996). Notably, the 2006 amendment to Rule 408 was made with the intent to retain the extensive case law finding the rule inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim. *See* Fed.R.Evid. 408, advisory committee's note, *citing, e.g., Coakley & Williams v. Structural Concrete Equip.*, 973 F.2d 349 (4th Cir. 1992) (evidence of settlement is not precluded by Rule 408 where offered to prove a party's intent with respect to the scope of a release); *Athey v. Farmers Ins. Exchange*, 234 F.3d 357 (8th Cir.2000) (admitting evidence of settlement offer by insurer to prove insurer's bad faith); *Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284 (6th Cir.1997) (threats made in settlement negotiations were admissible; Rule 408 is inapplicable when the claim is based upon a wrong that is committed during the course of settlement negotiations).

The cases upon which Phoenix relies to argue that the public policy behind Rule 408 is to favor compromise and settlement of disputes by shielding a party's negotiating

strategies or tactics do not comport with the present facts. In this case, Wells Fargo is seeking production of documents reflecting licensing negotiations between Phoenix and other third-party companies accused of infringing the patents-in-suit. The potential that damaging disclosures may interfere with the third-party negotiators' candor in such discussions or otherwise discourage third-parties from venturing into licensing/settlement talks is not sizeable. If anything, the disclosure of such documents could assist the third parties in fostering discussions with other alleged infringers and helping them to ascertain the extent of their own relative liability to Phoenix.

In a sleight of hand, Phoenix argues that any and all evidence of settlement negotiations should be protected because its disclosure could interfere with the party's candor or willingness to venture into settlement discussions. However, Phoenix's statement, which was copied verbatim from *American Soc. of Composers*, 1996 WL 157523 at *2, omitted the beginning of the sentence which reads "[d]epending upon the nature of the information ...." The court reminds Phoenix that Wells Fargo seeks the documents during the course of discovery and is not requesting admission of evidence at trial. Phoenix has failed to meet its burden to put forth a persuasive case for a settlement privilege that will protect third-party settlement negotiations from discovery. The court finds no convincing basis for Phoenix's proposition that its licensing negotiation communications are protected from discovery by a settlement privilege, embodied in Federal Rule of Evidence 408.

Further, the court lifts its previous oral prohibition on third-party contact made during the September 11, 2008 telephonic conference. If Wells Fargo wishes to seek production of the negotiation documents that reflect any representations or strategies that were considered by the third-party companies in response to Phoenix's license offers, Wells Fargo may request such documents directly from those third parties.

Finally, with regard to the Intervoice stipulation, the court reminds Phoenix that it ordered production of the Intervoice stipulation and all communications Phoenix had with Intervoice's counsel regarding that stipulation during the September 11, 2008 telephonic conference and expects Phoenix to comply with this order.

*CONCLUSION*

**IT IS ORDERED** that Phoenix shall produce all responsive documents within the scope of waiver of attorney-client privilege as defined herein.

**IT IS FURTHER ORDERED** that the parties, in preparing a stipulated protective order, shall prohibit dissemination of highly confidential information pertaining to the subject matter of the patents-in-suit to attorney Gross, unless he agrees to cease prosecuting Phoenix patent applications during the pendency of this case and for one year after the conclusion of this litigation, including any appeals. The parties are also ordered to rely to the greatest extent possible on this court's form protective order.

**IT IS FURTHER ORDERED** that Phoenix shall immediately produce (1) all documents related to the negotiation of licenses of, and licensing of, the patents-in-suit with any third party including, but not limited to, the parties listed in Phoenix's privilege log; and (2) all documents related to Phoenix's stipulation with Intervoice in the related *Phoenix v. Sony* action, 3:07–cv–002112– MHP.